**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **CHRISTINE DALLAS as the Administrator** ) | |
| **for the Estate of Jawan Lee McGee Dallas,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Civil Action No. 23-00466-KD-MU** |
| ) | |
| **CITY OF MOBILE, ALABAMA,** ) | |
| **JARRED HUTTO in his individual** ) | |
| **capacity, and CHRISTIAN DAVILLA in** ) | |
| **his individual capacity,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER

This action brought pursuant to 42 U.S.C. § 1983 for violations of the Fourth

Amendment and for violation of the laws of the State of Alabama is now before the Court on the

Motions for Summary judgment filed by Defendants City of Mobile, City of Mobile Police

Officer Jarred Hutto, and City of Mobile Police Officer Christian Davilla and evidence in

support (docs. 85, 87, 89-90, 91-93), Plaintiff Christine Dallas's Response in opposition (docs.

97-99), and the Defendants' Replies (docs. 101-103). Upon consideration, and for the reasons set

forth herein, the City's Motion is granted, Hutto's Motion is granted and Davila's Motion is

granted.[1]

I. Procedural background

In her Amended Complaint, Ms. Dallas alleges that in July 2023, Jawan Lee McGee

---

[1] Defendants' Motion in Limine to exclude Ms. Dallas's designated expert Natasha Powers from
offering opinions, conclusions, and testimony concerning the body-worn camera video
recordings at trial (doc. 84) and Motion in Limine to exclude Powers from offering medical
testimony at trial (doc. 86) are moot.

Dallas was struck, tased, and dry-stunned by Hutto and Davila and that Mr. Dallas died as a result (doc. 25). Pursuant to 42 U.S.C. § 1983, she alleged excessive force in violation of the Fourth Amendment against Hutto and Davila (Claim One), unlawful seizure in violation of the Fourth Amendment against Hutto and Davila (Claim Two), retaliation in violation of the First Amendment against Davila (Claim Three), and unconstitutional customs, policies, practices, or procedures against the City (Claim Four). She alleged state law claim of assault and battery against Hutto and Davila (Claim Five), wrongful death against Hutto and Davila (Claim Six), and wrongful death negligence/gross negligence against the City (Claim Seven).

The Second, Third and Fifth Claims against Davila and Hutto were dismissed (doc. 63). The Fourth Claim against the City was dismissed in part as to any claim for liability relating to alleged unlawful, customs, policies, practices, or procedures of police officers demanding identification be produced by individuals not suspected of illegal activity or claims otherwise connected to the violations asserted in the Second and Third Claims (doc. 64).

Defendants now move for summary judgment as to Claims One and Six against Davila and Hutto and Claims Four and Seven against the City.

II. <u>Findings of fact</u>[2]

On July 2, 2023, Davila, an Officer with the City of Mobile Police Department (MPD),[3]

---

[2] The facts at this stage of the litigation may not be the facts determined at trial. <u>See</u> <u>Cantu v. City of Dothan</u>, 974 F.3d 1217, 1222 (11th Cir. 2020) ("The 'facts' at the summary judgment stage are not necessarily the true, historical facts; they may not be what a jury at trial would, or will, determine to be the facts.").

[3] Office Davila was certified as a law enforcement officer by the Alabama Peace Officer Standards and Training Commission on August 12, 2022. On or about June 16, 2022, he completed the Taser 7 CEW V.22 User Certification Course from the Axon Academy, which trained him on the proper use of the Taser he was equipped with during the relevant events

was assigned to work third shift. Davila was assigned to ride with Hutto because Davila's patrol car had mechanical issues.    Davila and Hutto were equipped with body-worn cameras (BWC).

Soon after 21:30, Hutto and Davila received a call from MPD dispatch advising that a male subject was attempting to break into a residence at the Carol Plantation Mobile Home Park. Dispatch described the suspect as a homeless black male, wearing a hat and red shirt or possibly red pants[4] (doc. 97, Exhibit 3, Audio of Dispatch call to officers). Dispatch advised the Officers that the original call came from Lot 33 and that the suspect was last seen walking near Lot 27 inside the Mobile Home Park.

Hutto drove to the Mobile Home Park. When they arrived, they noticed three people running through the Park. At 21:50, Davila and Hutto approached Lot 27 on foot. Their BWC's

---

underlying this lawsuit. His duties on July 23, 2023, included enforcement of the criminal laws of the State of Alabama, investigating and reporting violations of the criminal laws, and he was empowered to arrest and take into custody persons who violate the criminal laws (doc. 88, Davila Affidavit).

[4] Ms. Dallas disputes this factual allegation. She states that MPD Dispatch told the Officers that the "suspect was a skinny homeless black male wearing a hat, a red shirt, and possibly red pants" (doc. 97, p. 4). Ms. Dallas cites to Exhibit 2, the audio of the 911 call by John Doss, the tenant at Lot 33 (doc. 97, Exhibit 2). In that conversation, the operator asked Doss if he knew the person or was it a stranger, and Doss answered: "He's a homeless guy that hangs around the trailer park".    The operator asked: "Is he a white male, black male, hispanic?" and Doss answered: "He's a black male" wearing "a red shirt or his pants might be red" and wearing a hat, but Doss was not sure of the color. Doss did not say "skinny". The 911 operator transferred Doss to MPD Dispatch (doc. 97, Exhibit 3). In that conversation, Doss told the 911 operator that the suspect was a "skinny black dude" who is "homeless" and "squatting" on property nearby. Doss stated again that the man was wearing a hat, and possibly a red shirt or red pants (Id.). Relevant here, in the call from Dispatch to the Officers, Dispatch said that the complainant advised that the subject was a "homeless male that frequents the area possibly attempting to break in to his trailer, homeless black male wearing a hat and red shirt, possible red pants, subject last seen near trailer 27" (Id., at 2:36). Dispatch did not tell the Officers that the suspect was "skinny". The MPD Event Chronology states: "Caller adv Male subj attempting to break into his trlr/subj BM wring hat and red shi or poss red pants/unkn weapons" (sic). And then "Call adv subj is poss homeless male that frequents area" (sic) (Doc. 97, Exh. 1).

were activated as Davila and Hutto approached a white male and a black male in the area between Lot 27 and Lot 28.

The white male was inside a locked fence in front of a trailer, and the black male was sitting in the driver's seat of a car just outside the fence where the white male was located (doc. 87, Exhibit 3, Hutto Body Worn Camera video). Among other questions, Hutto asked "Y'all stay here?" The black male, Jawan Dallas, answered "I just pulled up here" (21:50:57). The white male, Curtis Price, answered but his answer was unintelligible. Hutto asked several questions including whether Price had a "key to this place" and if he stayed there (21:51:31). Price answered in the negative. He was then asked: "How did you get in the gate" to which he responded, "I'll be honest with you I just took off running" and possibly "I don't know that." When asked if he knew anybody that lived in the trailer, he seemed to answer that he did. Hutto asked Price to climb back over the fence, which he did. Hutto asked him to provide his ID, and he was identified as Curtis Price.

While Hutto was speaking with Price, Davila asked Mr. Dallas, if he knew the white male. (21:51:42, doc. 87, Exhibit 2, Davila BWC). Mr. Dallas's response was unintelligible (21:51:43). Davila asked Mr. Dallas if he stayed there, and Mr. Dallas responded that he was waiting on his friends, and "they walked right around there", pointing in a direction away from the trailer, but the rest of his answer is unintelligible. (21:51:56).

Davila asked Mr. Dallas "Do you have an ID on you." Mr. Dallas responded "Yes sir" and began to look around inside the vehicle (21:52:01). Mr. Dallas stopped looking and asked several questions including: "What's the problem anyway?" (21:52:24-26). Hutto responded that "We had somebody call in and say they saw people trying to break into trailers" (21:52:27-31). Mr. Dallas and Price started talking at the same time, each explained why they were at the trailer.

4

Price stated among other responses, that he just pulled up to talk to a friend, but his friends took off running.[5]  Price stated "I swear to God, I had nothing to do with that. I just pulled up here." Mr. Dallas explained that he just pulled up and was looking for a friend, and he's not trying to cause problems.

Davila asked Mr. Dallas again: "do you have your ID with you" (21:52:40). Mr. Dallas answered "yea" and again looked around in his vehicle. He reached under the steering wheel and pulled up what appeared to be a USB cable. Hutto and Price continued to talk. Mr. Dallas stopped looking and joined their conversation. Mr. Dallas pointed to the area between two trailers, made a comment, and then asked: "I want to know who called, that's what I want to know." Davila then asked: "Hey man, give me your license" (21:53:10). Mr. Dallas responded "we want to know who called", "it's not fair for y'all to come out here and bother us", "we're not doing nothing man". During Mr. Dallas's response, Davila twice asked: "Your license".   He then asked: "what's your license number", "what's your license" (21:53:17). And Mr. Dallas responded: "Uh, I'll find it" (21:53:19).

Mr. Dallas continued to look for his ID inside the vehicle. He also continued to verbally contest being asked for the license and being questioned by the Officers. Hutto spoke again about Price being inside a locked gate, and Mr. Dallas told the Officers: "I am not in the gate, I pulled up, [unintelligible], "I want to know who called the police on us, that's what I want to know", "why was the police called, man, [unintelligible]" (21:53:30-39).

One of the Officers asked Mr. Dallas again: "Get your ID out, man" (21:53:41).   Mr.

---

[5] According to the interview with Jacqueline Kelley, she and two other people were with Mr. Dallas and they ran when they saw the police vehicle.

Dallas answered: "I'm trying to find it right now" and again looked around inside the vehicle. Then Mr. Dallas stated: "Damn, that's crazy shit, man". He put his head out the vehicle window and looked toward the area between the two trailers and said: "Y'all m_____'s take off running. Y'all got people out here f___ with folks ___." Mr. Dallas continued to look around inside the vehicle and looked out the window a few times (21:53:42-21:54:09).

Davila approached the vehicle and asked Mr. Dallas twice to open the door (21:54:10-14). Mr. Dallas responded "No, no, don't, that's illegal, that's illegal, that's illegal". Fearing that Mr. Dallas may have a gun,[6] (doc. 88, p. 7, Davila Affidavit) Davila reached in, opened the door, and as he asked Mr. Dallas to stand out, Davila took hold of Mr. Dallas's left shoulder with both hands and lifted Mr. Dallas out. Mr. Dallas rose to a partial stance with his head down and Davila continued to hold Mr. Dallas's arm (21:54:15-19, doc. 87, Exhibit 2, Davila BWC). At this point, the BWC shows that Mr. Dallas was wearing a white undershirt and red shorts.

Mr. Dallas stepped forward in an attempt to flee.[7] Davila's left arm was across Mr. Dallas's chest, and his right arm was around Mr. Dallas's shoulders (21:54:20-21, doc. 87, Exhibit 3, Hutto BWC). Davila asked: "where you going, where you going, man" (21:54:21). Mr. Dallas responded "I ain't going nowhere" (21:54:22). Mr. Dallas stepped away from Davila and toward Hutto. Hutto reached out and took Mr. Dallas's right upper arm as Davila turned Mr.

---

[6] A gun was later found in the vehicle (doc. 88, p. 15, MPD Crime Scene Photograph of Firearm). The gun was on the floor behind the driver's seat.

[7] Ms. Dallas admits that Mr. Dallas was trying to get away from the Officers (doc. 97, p. 3, Introduction) ("In an effort to evade Officers Davila and Hutto, he fled, as there was no reasonable suspicion or probable cause to warrant his detention.") (doc. 97, p. 11) ("Once out of the car, Defendant Davila grabbed Mr. Dallas, and Mr. Dallas pulled away from Defendant Davila.)

Dallas toward the back of Mr. Dallas's vehicle. Davila's right hand was under Mr. Dallas's right arm at chest level. Mr. Dallas and possibly Davila fell against the side of Mr. Dallas's vehicle. The Officers appeared to try to hold on to Mr. Dallas as he moved toward the rear (21:54:23-24). The three men fell to the ground as the Officers tried to hold on to Mr. Dallas.[8]

Davila's BWC recorded rapidly changing images and sounds and then fell off Davila and went black until an officer picked it up and turned it over (doc. 87, Exhibit 2, 21:54:26-22:06:27). Although the BWC fell off Davila, it continued to record the sounds. Later, Davila picked up the BWC and replaced it on his body (22:07:11).

Hutto's BWC also recorded rapidly changing images and sounds (doc. 87, Exhibit 3). His BWC confirms that the Officers and Mr. Dallas were on the ground in the grass and struggling sounds are heard (21:54:25-29). An Officer said "What the hell" (21:54:35). Mr. Dallas grunted and yelled "ay". Hutto said "quit fighting". The first dry stun can be heard (21:54:48).[9]

---

[8] Ms. Dallas does not dispute that the Officers tackled Mr. Dallas and that they fell to the ground (doc. 97, p. 3, Introduction) ("During his attempt to escape, Officers Davila and Hutto tackled him to the ground.") (doc. 97, p. 11) ("Defendant Davila was able to maintain hold of Mr. Dallas and he, along with Defendant Hutto tackles Mr. Dallas to the ground.").

[9] According to the Taser Log and Taser Timeline for the dry stuns, "electricity discharged" at 21:54:48 (doc. 97, Exhibits 8 & 9, p. 1). Between 21:54:48 and 21:55:21, or 33 seconds, "electricity discharged" twenty times and "Contact w/a Medium" ranged from 0.087 seconds to 0.0874 seconds (Id., p. 1-2). Three times, the Timeline indicates "No Contact Made" and twice "Inconclusive" (doc. 97, Exhibit 9). "Contact w/a Medium" was confirmed on fifteen discharges. The Log indicates an "Audible Alert: Discharge Auto-Shutdown Warning" occurred at 21:55:25. The Timeline indicates that the Taser was turned off at 21:55:25, after the last dry stun. In the Report of Autopsy, the medical examiner found three abrasions which he identified as "consistent with dry stun injuries" (doc. 88, p. 22).

Mr. Dallas continued to grunt and yell, and the intermittent dry stuns can be heard. Mr. Dallas rolled onto his back (21:55:06). Hutto said "Quit fighting" (21:55:10). Mr. Dallas continued to yell and move. Then Davila said "Let go of the f____ taser" (21:55:18). Then Mr. Dallas said "Please, sir, I can't breathe, I can't breathe, I can't breathe." Help, Help, Help," (21:55:21). Davila again said "Let go of the f_____ taser" (21:55:28). Mr. Dallas continued yelling "Help, Help, Help, …" (21:55:29-34). The struggle continued. Hutto said "Don't bite me" (21:55:56). Davila regained control of the Taser and stood up.

Hutto and Mr. Dallas continued rolling on the ground. Mr. Dallas rolled over and his back was exposed. Davila deployed the first Taser prongs into Mr. Dallas's back (21:56:08). The first deployment did not send an electrical current because the prongs landed too close (doc. 88, p. 9, Davila Affidavit). With the second deployment, Mr. Dallas reacted with painful sounds.[10] Hutto said "quit fighting" and asked Davila to "call for additional units" (21:56:22-32) (doc. 87, Exhibit 2, Hutto BWC). Mr. Dallas screamed again (21:56:32). Davila called for additional units (21:56:47). Mr. Dallas screamed again (21:56:50).

After the last deployment, Mr. Dallas was on the ground and Hutto appeared to kneel next to him, possibly holding his shoulders. Mr. Dallas said "Help, let me up" (21:57:11-13). Hutto said "I'm not letting you up, you keep fighting us" and "quit fighting us" (21:57:14-15, 19). Mr. Dallas answered "Okay" (21:57:20-21). Hutto asked "You gonna stop fighting" (21:57:23). Mr. Dallas responded "Yes sir, Yes sir" (21:57:23-24). Hutto responded "Alright" (21:57:25). Mr. Dallas then says: "Please, please, can't breathe, can't breathe." (21:57:27-32).

---

[10] According to the Taser Log and Taser Timeline, the Taser was deployed for 4.965 seconds. And cycled four times ranging from 4.948 seconds to 4.958 seconds (doc. 97, Exhibits 8 & 9).

Davila said "Shut the ___ up. Mr. Dallas continued "can't breathe, where am I, where am I, where am I, where am I, where am I, where am I". Davila again said "shut the ___ up" (21:57:43-44).

The Officers rolled Mr. Dallas over from his stomach to his back and Hutto told him if he tried to get up, he would get tased again (21:57:47). Davila kneeled by Mr. Dallas who continued to talk and move. Hutto called in "322 … one detained" (21:58:14). Davila told Mr. Dallas again to "Shut the f___ up" (21:58:15). Hutto spoke again but his statements were not clear (21:58:29-30). Davila told Mr. Dallas to "Shut the f___ up" twice more (21:58:34-35). Hutto called in "Code Zebra" (21:58:44). He told Mr. Dallas that medical and backup officers were coming and to be still.

The back up officers arrived (22:01:01) and Mr. Dallas was rolled onto his stomach so that the prongs could be removed (22:01:01-22:03:05). Dallas groaned as the backup officers pulled out the prongs. Hutto told Mr. Dallas "They've got to come out". Mr. Dallas responded that he could not breath and asked for help. Mr. Dallas was rolled over and then, one of the backup officers sat him up (22:04:29). Mr. Dallas asked to lie down, and the officer laid him on the ground (22:05:17). Hutto, Davila, and another Officer placed Mr. Dallas in the back seat of Hutto's vehicle (22:06:28). Mr. Dallas had difficulty walking and talked incoherently. Mr. Dallas yelled while he was in the police car.

The paramedics arrived approximately fourteen minutes after the struggle ended (22:11:16). The paramedic opened the door to examine Mr. Dallas. She identified herself and said "Don't fight". The paramedic questioned Mr. Dallas about pain and he answered "Right arm", said "I can't breathe" and repeated "help me please". During this time, Hutto told Mr. Dallas twice not to try to get out. Another paramedic asked Mr. Dallas to sit up and appeared to

9

place a monitor on his arm. Mr. Dallas sat up in the back seat. The paramedics appeared to have difficulty placing the monitor or getting it to work (22:11:30-22:15:00). One paramedic then asked Mr. Dallas to "sit up and lean that way" so that she could reach his other arm (22:15:15-22). The other paramedic continued to look at the monitor screen. One paramedic spoke to Mr. Dallas, appeared to examine him, and then asked "Can you please sit up, come on man" (22:16:55). She stepped back, and the other paramedic examined Mr. Dallas and then said "Pull him out of the car" (22:17:09-13). At this point, Mr. Dallas was placed on the ground and the paramedics begin CPR. Ultimately Mr. Dallas was transported to an emergency room where he was pronounced dead.[11]

    B. <u>Cause of Death</u>.

    Dr. Cameron Snider, a medical examiner with the Alabama Department of Forensic Sciences performed a forensic analysis, autopsy, and death investigation concerning Mr. Dallas's death (doc. 92-2, Affidavit of Dr. Snider). As part of his analysis, Dr. Snider reviewed the Toxicological Analysis Report performed by Robert M. Lockwood, Ph.D., a toxicologist at the

---

[11]  Dallas disputes the allegation that Mr. Dallas showed physical violence toward the Officers. She alleges that Mr. Dallas was subjected to "excessive drives stunning and tasing by Davila" and in "response to the pain inflicted upon him, [Mr. Dallas] physically resisted the excessive drive stunning". She alleges that Mr. Dallas repeatedly screamed while the dry stun was applied (doc. 97, p. 4-7). Dallas relies upon the testimony of expert witness Natasha Powers. She testified that the dry stun "is a pain compliance device or tool" and that "you don't want to misinterpret someone moving away from pain when pain is applied as continued resistance." (doc. 99, p. 205). Davila argues that Powers' testimony that Mr. Dallas was moving away from the pain and not resisting should be stricken because it "is not based on medical or scientific grounds, but mere speculation and conjecture" and that Powers is not competent to testify at trial about pain compliance and its effect on the body (doc. 101, p. 3).

ADFS. The Report indicated that Mr. Dallas was under the influence of methamphetamine, synthetic cannabinoid ABD-BUTINACA, and synthetic cannabinoid MDMB-4en-PINACA at the time of his death. Dr. Snider found that Mr. Dallas's behavior towards the Officers was consistent with the effects of these drugs in his system at that time.

Dr. Snider "concluded to a reasonable degree of medical probability and certainty that [Mr. Dallas] died as a result of acute myocardial ischemia and cardiorespiratory failure caused by mixed drug toxicity – including toxicity from the presence of methamphetamine, ABD-BUTINACA, and MDMB-4en-PINACA" (Id. at ¶ 13.). He also concluded "to a reasonable degree of medical probability and certainty that the Taser deployment on July 2, 2023 did not cause [Mr. Dallas's] death." (Id.).

In the Report of Autopsy, the "Final Diagnosis" is reported as:

I.   Evidence of mixed drug toxicity resulting in terminal myocardial ischemia:

A. Toxicological Analysis Report, which is positive for the sympathomimetic amine, Methamphetamine, and its metabolite and for the psychoactive synthetic cannabinoid receptor agonists, ABD-BUTINACA, and MDMB-4en-PINACA.
B. Reported exertional behavioral manifestations of mixed drug intoxication.
C. Documented chemical odor noted by treating medical personnel.
D. Documented complaint of respiratory distress followed by onset of rapid monitored bradycardia and apnea and pulselessness.
E.   Acute myocardial ischemia confirmed by microscopy.
F. Diffuse vascular congestion of the major organs and lungs.
G. Mild swelling and vascular congestion of the brain.

II. Cutaneous blunt force and cutaneous/subcutaneous conductive electrical device (dry stun and probe) injuries.

III. Lymphocytic thyroiditis.

11

(Doc. 92-2, p. 6).

The "Cause of Death" is listed as "Cardiorespiratory failure, Due to acute myocardial ischemia, Due to methamphetamine, ABD-BUTINACA, and MDMB-4en-PINACA toxicity." (doc. 92-2, p. 7).   With "Contributory: Cardiomegaly with left ventricular hypertrophy, Exertion during an arrest process" and that the "Manner of Death" was "Accident." (Id.).

Dr. Snider found three abrasions that were "consistent with dry stun injuries" (Id., p. 7). He found six punctures on Mr. Dallas's back. Four were consistent with "deeper" Taser probe injuries. Two of these four punctures were consistent with the "dull portions of the probes on the cutaneous surface." He found two punctures that were consistent with "shallow" Taser probe injuries (Id.)

III. Officer Hutto

Ms. Dallas claims that Hutto violated Mr. Dallas' Fourth Amendment right to be free from the use of force and excessive force during an arrest (doc. 25, p. 12-15, Claim One). She also claims that Hutto along with Davila "committed an assault and battery when they knowingly struck and tased Jawan Dallas that resulted in the untimely and unlawful death of Jawan Dallas." (Id., p. 28-30, Claim Six, "Wrongful Death").

In her consolidated response to the motions for summary judgment, Ms. Dallas states "The Plaintiff does not contest Defendant Hutto's Motion for Summary Judgment" (doc. 97, p. 25). In reply, Hutto argues that this Court cannot enter summary judgment "'on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion.'" (doc. 102, p. 1). Hutto cites United States v. One Piece of Property, 363 F. 3d 1099, 1101-1102 (11th Cir. 2004). In that case, the defendant property owner "never responded" to the United States' motion for summary judgment. Id. at 1101.

However, in this procedural posture, where Ms. Dallas responds to the Motions and specifically states that she "does not contest" Hutto's motion,[12] the Court may deem Ms. Dallas' remaining claims against Hutto in Claims One and Six as conceded. Ms. Dallas affirmatively chose not to argue these claims in this Court. See Glenn as next friend, A.G. v. Britt, No. 23-11890, 2025 WL 1833956, at *2, n. 9 (11th Cir. July 3, 2025) ("During the summary judgment briefing, Glenn conceded the federal claim of unlawful seizure and the state law claim for battery by affirmatively choosing not to argue them before the district court. See Baxter v. Santiago-Miranda, 121 F.4th 873, 884 (11th Cir. 2024) ("[I]f a plaintiff chooses not to amend his complaint" to drop a claim, "he may instead concede a claim in the district court" by failing to address it in his "initial response to [a] summary judgment motion."). Accordingly, Hutto's Motion for Summary Judgment is granted.

IV. City of Mobile

A. Claim Four

In Claim Four, brought pursuant to 42 U.S.C. § 1983, Ms. Dallas alleges that the City's, and its Police Department's, "customs, policies, practices, and/or procedures, were a moving force and/or a proximate cause of the deprivations of Jawan's" constitutional rights. She also alleges that these customs, etc., were "directed, encouraged, allowed and/or ratified by" the City's policymakers (doc. 25, p. 24-26).[13]

---

[12] Additionally, Ms. Dallas did not list any argument regarding Hutto in her Table of Contents (doc. 97, p. 2).

[13] Ms. Dallas alleges the following specific customs, policies, practices, and/or procedures: "a. To use or tolerate the use of excessive and/or unjustified force; b. To create unnecessary danger and risk of serious harm or death, with deliberate indifference, to an unarmed non threaten person; c. To cover-up violations of constitutional rights by failing to properly investigate and/or evaluate officer involved use of force and by ignoring and/or failing to properly and adequately

The City moves for summary judgment as to Claim Four. The City argues that Ms. Dallas cannot demonstrate that Mr. Dallas's constitutional rights were violated by Hutto and Davila and since there is no underlying constitutional violation, the City is entitled to summary judgment. Alternatively, the City argues that even if Mr. Dallas's constitutional rights were violated, Ms. Dallas cannot succeed on her claim pursuant to Monell v. Dep't of Social Services of City of New York, 436 U.S. 658, 690 (1978) because she cannot show that it had a custom, policy, practice or procedures that constituted deliberate indifference to Mr. Dallas's constitutional rights and that the custom, policy, practice or procedures caused the constitutional violation (doc. 89, p. 7-9).14   The City also argues that because Ms. Dallas did not respond to the City's Monell argument, the Court may consider Claim Four as abandoned (doc. 103, Reply).

The Court of Appeals for the Eleventh Circuit has held that a party may abandon a claim by "failing to 'plainly and prominently raise it, for instance by devoting a discrete section of his argument to' that claim", by making "only 'passing reference' … 'embedded under different topical headings'", or where the "references to the issue are 'mere background to the appellant's

---

investigate and discipline unconstitutional or unlawful activity by their officers; d. To allow, tolerate, and/or encourage a "code of silence" among their officers, whereby an officer does not provide adverse information against a fellow officer; e. To use or tolerate inadequate, deficient, and improper procedures for handling, investigating, and reviewing complaints of law enforcement officer misconduct;" and for failing "to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline officers of the Mobile Police Department." (doc. 25, p. 25-26).

14  Although Ms. Dallas did not cite Monell in her Amended Complaint, the Section 1983 claims raised in Claim Four are based on a Monell legal theory– that a municipality could be liable for constitutional violations under Section 1983, if Ms. Dallas could show "(1) that [Jawan Dallas'] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the [municipality's] policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004); see McCants v. City of Mobile, 752 Fed. Appx. 744, 748 (11th Cir. 2018) (same).

main arguments or when buried within those arguments." <u>Dash 224 LLC v. Aerovias de Integracion Reg'l Aires SA</u>, 605 Fed. Appx. 868, 870 (11th Cir. 2015) (citations omitted); <u>See Bullock v. Newtek Small Business Finance, Inc</u>., 808 Fed. Appx. 698, 701 (11th Cir. 2020) (finding that plaintiff abandoned or waived her claim of breach of ordinary care "by failing to raise those arguments in response to Defendants' motions for summary judgment").

Here, Ms. Dallas did not identify a section of her response as responsive to the City's argument regarding Claim Four (doc. 97, p. 2, Table of Contents), and she did not raise any argument that could reasonably be considered as responsive to the City's argument. Moreover, to date, Ms. Dallas has not moved the Court for leave to file a surreply to the City's reply. Accordingly, the Court finds that Ms. Dallas has abandoned[15] Claim Four and the City is entitled to summary judgment as that claim.

B. <u>Claim Seven</u>

In Claim Seven, captioned "Wrongful Death Negligence/Gross Negligence" and brought pursuant to Alabama law, Ms. Dallas alleges that the City is liable for Davila's and Hutto's[16]

---

[15] This Court has noted that "[w]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore the consider the claim abandoned." <u>Powell v. Am. Remediation & Env't, Inc</u>., 61 F. Supp. 3d 1244, 1252, fn. 9 (S.D. Ala. 2014), aff'd, 618 Fed. Appx. 974 (11th Cir. 2015) (discussing the appearance of conflict between how district courts should address a non-movant's failure to respond to some but not all arguments in a motion for summary judgment which results in an abandonment of specific claims or defenses and how district courts should address a non-movant's overall failure to respond to a motion for summary judgment).

[16] The City argues that when its liability is for "neglect, carelessness, or unskillfulness" and is based on the acts of a police officer under respondeat superior principles, it is entitled to summary judgment on the claim to the same extent as the officer would be entitled. (doc. 89, p. 12-13). Thus, the City is entitled to judgment in its favor as to any claim based on the acts of Officer Hutto because summary judgment has been granted in his favor. <u>See Early v. City of Gardendale</u>, No. 2:20-CV-1368-RDP, 2022 WL 2758528, at *9 (N.D. Ala. July 14, 2022) ("If

"lack of skills or carelessness" while acting within the scope of their employment (doc. 25, p. 30-31). Ms. Dallas alleges that their "actions fell below that response which a skilled or proficient officer would exercise in a similar circumstance as a result Jawan Dallas died" and that their "unskillfulness and carelessness … are imputed to the City of Mobile through the doctrines of agency, vicarious liability, and respondeat superior" (Id., p. 31-32).

The City argues that it is immune from tort liability for Davila's alleged negligent, careless, or unskillful conduct under Ala. Code § 6-5-338(b) (peace officer immunity) and Ala. Code § 11-47-190. The City points out that in Ex Parte Cranman, 792 So. 2d 392 (Ala. 2000), modified by Hollis v. City of Brighton, 950 So. 2d 300 (Ala. 2006), the Alabama Supreme Court restated and clarified the scope of the state-agent immunity doctrine, established a burden-shifting framework for application of the state-agent immunity test, and explained that the Cranman test "also governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under Ala. Code § 6-5-338(a)", which provides peace officer immunity or statutory immunity[17]  (doc 89, p. 14; n. 4, p. 15). The City argues that law enforcement officers carrying out discretionary functions even if negligent, careless or unskillful are immune from tort liability under Ala. Code § 6-5-338(a) (Id., p. 13), and if the officer is immune, then the City is likewise immune. Ala. Code § 6-5-338(b) ("This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint

---

the employee is not liable for any tort, then the municipality is absolved.") (citations omitted)

[17]  Peace officers "shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a). The City states that a new immunity statute, "Back the Blue," Ala. Code § 6-5-338.2 repealed and replaced Ala. Code §6-5-338. The new statute only applies to causes of action accruing on or after October 1, 2025. Ala. Code § 6-5-338.4(a).

peace officers." Ala. Code § 6-5-338(b)).

Applying the burden-shifting framework, the City argues that because Davila met his burden of showing that the claims against him arose from the performance of discretionary functions within the scope of his law enforcement duties, the burden shifts to Ms. Dallas to show that Davila's conduct falls within one of the <u>Cranman</u> exceptions[18] to immunity. Specifically, the City argues that Ms. Dallas must show that Davila acted willfully, maliciously, fraudulently, in bad faith, or beyond his authority, or under a mistaken interpretation of the law.[19]

However, the City argues that if Ms. Dallas could show that Davila's actions fell within this exception, then the City is immune under Ala. Code § 11-47-190. (Id., p. 15-16). This statute protects the City from liability "unless [an] injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality engaged in work therefor and while acting in the line of his or her duty." (Id., p. 15-17).[20]

In response, Ms. Dallas states nonsensically that the "City of Mobile, Alabama is not summary judgment Plaintiff's claim that Defendant Davila based on the lack of skills or

---

[18] <u>Ex parte Cranman</u> contains two exceptions: 1) "when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise" and 2) "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." 792 So. 2d 392, 405 (Ala. 2000).

[19] The City did not mention the other <u>Cranman</u> exception: "when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise." 792 So. 2d at 405.

[20] In its reply, the City states that Ms. Dallas failed to respond to its argument that the City cannot be liable for its employees' conduct unless based on "'neglect, carelessness, or unskillfulness' pursuant to Ala. Code § 11-47-190" (doc. 103, p. 5).

carelessness of Defendant Davila." (*sic*) (doc. 97, p. 4). She appears to argue that the City is not entitled to summary judgment as to Claim Seven. However, Ms. Dallas makes this statement in her Introduction (Id., p. 3-4). She does not develop this argument. She does not provide any factual or legal authority for her position. Her argument consists solely of this one unsupported conclusory statement made in the Introduction. Thus, Ms. Dallas has abandoned Claim Seven. See Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681-682 (11th Cir. 2014) ("Abandonment of a claim or issue can also occur when the passing references to it are made in the 'statement of the case' or 'summary of the argument,'" without further elaboration in the argument section).

That Ms. Dallas has abandoned Claim Seven as pled is made more apparent by her current argument that the "City of Mobile is liable under *respondeat superior*" because Davila acted with "willfulness, malice, fraudulent intent, in bad faith, and beyond the scope of his authority by excessively employing a stun device and taser against Mr. Dallas." (doc. 97, p. 2, Table of Contents;[21] p. 23-24). Ms. Dallas now argues that "the record is filled with evidence demonstrating that Defendant Davila acted with malice, fraudulent intent, in bad faith, and beyond the scope of his authority by excessively employing a stun device and taser against Mr. Dallas." (doc. 97, p. 23-24). She also argues that "the City of Mobile cannot claim summary judgment regarding the Plaintiff's assertion that the City of Mobile is liable under respondeat superior for Davila's actions that were willful, malicious, fraudulent, in bad faith, or beyond his

---

[21] "D. City of Mobile is liable under respondeat superior for Davila's willfully, maliciously, fraudulently, in bad faith, or beyond his authority".

authority." (Id., p. 25, Conclusion).[22]  Ms. Dallas appears to argue that since Davila's conduct does not entitle him to peace officer's immunity under Ala. Code § 6-5-338, the City likewise is not entitled immunity.

By so doing, Ms. Dallas attempts to change the legal theory expressed in her Amended Complaint where she claims that the City is liable under a theory of respondeat superior for Davila's "lack of skills or carelessness" while acting within the scope of his employment and that his unskillfulness and carelessness caused Mr. Dallas's death (doc. 25, p. 30-31). However, Ms. Dallas cannot amend Claim Seven by arguing different conduct on the part of Davila in her response. Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (finding that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment"); Balbin v. Johnson, No. 22-11182, 2025 WL 883064, at *3 (11th Cir. Mar. 19, 2025) (same as to a response to a motion to dismiss).

Even if an amendment were allowed and Ms. Dallas could show that Davila would not be immune because his conduct fell within the Cranman exception for conduct that is willful, malicious, etc., the City would still be immune pursuant to Ala. Code § 11-47-190. Brown v. City of Huntsville, 608 F.3d 724, 743 (11th Cir. 2010) (finding that "all of Brown's evidence indicated that [Officer] Norris's use of pepper spray and other force against her was intentional, as opposed to neglectful or careless" and affirming the district court's grant of immunity to the City pursuant to Ala. Code § 11–47–190); see McElroy v. City of Bessemer, Ala., No. 2:15-CV-00120-JHE, 2015 WL 1636604, at *5–6 (N.D. Ala. Apr. 13, 2015) (The wrongful death claim

---

[22] Ms. Dallas does not mention the City in her argument on pages 23 and 24. Instead, she argues that Davila is not entitled to immunity on the state law wrongful death claim. The City is mentioned only in the caption to Section D.

attempts to hold the City liab[le] under the theory of *respondeat superior* based on Officer

Kinderknecht and others' alleged "willful, malicious, intentional, and completely in bad faith"

conduct, which is not permitted under Alabama law. Ala. Code § 11-47-190 … Because the

claim attempts to impose municipal liability for alleged willful or intentional conduct based on a

theory of *respondeat superior,* Defendants' motion is GRANTED as to the wrongful death

claim.) (internal citations omitted) (bracketed text added).

The City may be liable under a theory of respondeat superior for claims based only for

the neglect, carelessness or unskillfulness of its employees, Ala. Code § 11-47-190. But that

claim – Claim Seven - has been abandoned. Accordingly, the City's Motion is granted as to

Claim Seven.

V. <u>Officer Davila</u>

A. <u>Claim One – Excessive Force</u>

In Claim One, brought pursuant to 42 U.S.C. § 1983, Ms. Dallas alleges that Davila

violated Mr. Dallas's constitutional right under the Fourth Amendment. Specifically, that Davila

used excessive force during the seizure of Mr. Dallas and acted deliberately, willfully,

maliciously, in bad faith and in reckless disregard of Mr. Dallas's constitutional right.   Ms.

Dallas alleges that Mr. Dallas died because of Davila's unlawful conduct. (doc. 25, p. 12-15).

On Motion for Summary Judgment, Davila argues that he is entitled to qualified

immunity as to this Claim (doc. 87, p. 16-24). Davila argues that he was performing a

discretionary function within the scope of his discretionary authority during the relevant events.

Specifically, the incident occurred during an investigation of a burglary-in-progress call, the

encounter with Mr. Dallas and Price was an investigatory stop which allowed Davila and Hutto

to temporarily detain Mr. Dallas to investigate possible criminal activity based on specific

facts,[23] and when Mr. Dallas "became non-compliant and attempted to flee and resisted arrest, Officer Davila's use of a taser to effect the arrest was a discretionary function." (Id., p. 17-18).

Davila points out that when discretionary authority is established, the burden shifts to Ms. Dallas to show that he is not entitled to qualified immunity. (Id., p. 19). Davila argues that Ms. Dallas cannot meet her burden to show that Davila's conduct violated Mr. Dallas's Fourth Amendment constitutional right to be free from excessive force during a seizure and that she cannot meet her burden to show that the violation of a clearly established Fourth Amendment right.

Ms. Dallas does not dispute that Davila was acting within his discretionary authority. She argues that qualified immunity should be denied because there is a genuine issue of fact as to whether Mr. Dallas resisted the Officers' attempt to handcuffs him or whether he was "reacting to pain from being dry stunned 15 times and tased for an estimated duration of 40 seconds" (doc. 97, p. 16). She argues that Davila "failed to assess whether his perception of Mr. Dallas's resistance was accurate or if it was his own irresponsible and egregious behavior" that led to the 15 dry stuns (Id., p. 17-18). She also argues that Mr. Dallas's cries for help and pleading to Davila to stop the dry stuns were ignored by Davila and he continued to apply the dry stun (Id., p. 17-18). Ms. Dallas also argues that when Davila deployed the Taser probes, he "failed to reassess whether his perception of Mr. Dallas's resistance was accurate or if it was his own irresponsible and egregious behavior that led" to tasing Mr. Dallas for "an estimated duration of

---

[23]  Davila points out that Mr. Dallas and Price "could not provide an explanation for why they were there", Price was inside a locked fence at a trailer where he did not live nor know anyone, Mr. Dallas's "answers to Davila's questions did not make sense", and Mr. Dallas "matched the description of the burglary suspect." (doc. 87, p. 15).

40 seconds before his Taser shut down." (Id. p. 18).

Relying upon the testimony of her expert witness Natasha Powers, Ms. Dallas argues that Mr. Dallas was not resisting arrest but was instinctively reacting to the burning pain of the stun drives and moving away from the source of the pain, the Taser (Id., p. 17). Ms. Dallas also relies upon the body worn camera video, Taser Log, and Taser Timeline to support her factual allegation that Mr. Dallas was dry stunned 15 times and then tased for an estimated 40 seconds "until the audible discharge alert auto shut down warning was triggered" (Id., p. 17-18). Ms. Dallas also relies upon a Taser Warnings, Risks & Release Agreement that was an exhibit to Powers' deposition to argue that Davila's extended use of the dry stun and tasing exceeded or nearly exceeded the use in the Warnings. Also, she points out that the Warnings state that a person may react to a tasing by making rapid or unexpected movements (Id., p. 15-19).

Ms. Dallas "acknowledges that pain compliance techniques are designed to elicit compliance; however, should the suspect's resistance be involuntary or directly induced by pain, the continued application of force may swiftly escalate to a level that is disproportionate. This was the case in this matter." (Id., p. 19). Ms. Dallas argues that even if the initial resistance justified use of the Taser, if Mr. Dallas stopped resisting then further deployments were unreasonable (Id.). She argues that "construing the facts" in favor of her evidence "and body camera evidence, at some point Mr. Dallas was no longer resisting when he was drive stun[ed] 15 times and tased for almost 40 seconds." (Id., p. 20).

In reply,[24] Davila argues that Ms. Dallas has no evidence from which a jury could

---

[24] Davila also objects to Ms. Dallas's statement of undisputed facts. Specifically, he argues that Mr. Dallas did match the description of the burglary suspect, and that Ms. Dallas's expert witness Powers agreed that he did (doc. 101, p. 2, citing Doc. 99, p. 112). He argues that Mr. Dallas was resisting their efforts to restrain him from fleeing (Id., p. 2-3). Davila incorporates the

reasonably conclude that Mr. Dallas was responding to the pain of the dry stuns and taser and not resisting or fighting the Officers. Davila argues that Powers's testimony is the only evidence submitted but Powers is not qualified to testify about pain compliance, the effects of the dry stuns or tasing on the body or to offer an opinion that Mr. Dallas's resistance was a reaction to the dry stuns or tasing.[25]   He argues that Powers's opinion "is not based on medical or scientific grounds, but [instead] mere speculation and conjecture." (doc. 101, p. 3). Davila objects pursuant

---

arguments in Defendants' motion in limine to exclude Powers from offering opinions, conclusions and testimony concerning interpretations of the body camera video recording (doc. 84). Davila also incorporates the arguments in Defendants' motion in limine to exclude any medical testimony by Powers as to the cause or manner of death (doc. 86). Davila argues that Ms. Dallas's allegations as to the number of times his Taser made contact with Mr. Dallas was based on speculation and not supported by the evidence. (Id., p. 3-4). Specifically, that she cannot rely on the Taser Log and Taser Timeline because these documents only show when the button was pressed or when the taser probes were deployed and do not show "when and for how long" the Taser made contact with Mr. Davis, or the effectiveness of the dry stuns. Davila points out that the autopsy report shows that Mr. Dallas received three dry stuns.

[25]   Davila incorporates the arguments in Defendants' motion in limine to exclude Powers from offering opinions, conclusions and testimony concerning the body camera video recording (doc. 84). Defendants argue that Powers admitted that she watched the video on a common video player at various speeds and frames, that she is not a video or audio forensic analyst expert, and that she doesn't have the ability or expertise to see anything anyone else could not see from watching the video. Defendants argue that her opinions and testimony regarding what she saw and heard on the video would be unhelpful to the jury to understand the evidence and determine an issue of fact. Davila also incorporates the arguments in Defendants' motion to in limine to exclude any medical testimony by Powers as to the cause or manner of death (doc. 86). In that motion, Defendants point out that Powers is a former police officer and she was disclosed as an expert on police practices" "My role as a police practices expert is to assist in understanding what constitutes 'established police practices and guidelines' and how these practices and guidelines are applied during police-citizen encounters." (doc. 86). Defendants argue that despite any knowledge, skill, experience, training or education that would qualify her to render a pathology, forensic, or medical opinion, Ms. Dallas obtained testimony from Powers about multiple medical issues such as cardiac risk, acute myocardial ischemia, cumulative exhaustion, etc., which could increase the risk of death or serious injury (Id.).

to Fed. R. Civ. P. 56(c)(2)[26]  that Powers's testimony would be inadmissible at trial under Fed. R. Evid. 702. Davila points out that Powers affirmed in her deposition that she has no medical education, is not a doctor, has not had any medical training, nor has she performed any medical research on this issue (doc. 101, p. 2, 9, n. 8).

Davila argues that Ms. Dallas has not met her burden to show that his conduct violated the Fourth Amendment. He asserts that her argument is centered on the position that Mr. Dallas was not resisting but instead was reacting to the pain from the dry stuns. However, Davila points out that Ms. Dallas's own expert witness, Powers, testified that Mr. Dallas, tried to flee, was tackled by the Officers, then actively resisted their efforts to gain control, and that the use of the Taser stopped as soon as he was handcuffed (doc.101, p. 8, citing doc. 99, p. 100:22 – 101:2).

Davila argues Ms. Dallas's reliance on the Taser Warning[27]  – to argue that the alleged duration of the Taser use in dry stun or deployment – is inconsequential because Ms. Dallas has not presented any evidence as to how many times Mr. Dallas was tased. He argues that even if Mr. Dallas was dry stunned fifteen times, Ms. Dallas has not presented any precedent that this use was excessive when an officer is confronted with resistance and fighting (doc. 101, p. 8).

---

[26]  "Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

[27]  Davila also objects to Ms. Dallas's use of the Taser Warning document because it cannot be presented in an admissible form at trial. Davila points out that the Taser Warning is unsigned, unsworn and that Ms. Dallas cannot establish "who created it, when it was created, whether Davila was trained on this document, or whether it was even applicable to the Taser used in this case" (doc. 101, p. 8, n. 7). Davila points out that the Taser Warning is dated December 2018 which is nearly five years before the instant incident.

Davila also rebuts Ms. Dallas's argument that he failed to consider that Mr. Dallas's resistance was a natural reaction, i.e., an attempt to withdraw from the dry stun. Davila argues that he continually assessed the Taser's effect on Mr. Dallas and as evidenced by his testimony that the dry stuns had no effect and that Mr. Dallas continued to fight, and the even the probe deployment did not immediately stop his resistance (Id. p. 8-9).

Davila also argues that the question of whether the force used during an arrest is excessive is a question of law for the Court to decide and that the only competent evidence is the Officers' testimony and the BWC videos which support their testimony.[28] He argues that Ms. Dallas' position that "at some point Mr. Dallas was no longer resisting" without evidence to show that he was tased beyond that point is not sufficient to survive summary judgment. (doc. 101, p. 9-10).

1. Standard of Review

When deciding a claim of qualified immunity at the summary judgment stage, the Court must "'resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts.'" Id.  "At this stage, [the Court must] review the evidence, draw all reasonable inferences, and resolve all doubts in favor of the non-moving party – but only to the extent supportable by the record." Myrick v. Fulton County, Georgia, 69 F.4th 1277, 1300 (11th Cir. 2023).

However, when a video has recorded the conduct at issue, the Supreme Court indicates

---

[28]  Davila points out that during the fight, Hutto repeatedly told Mr. Dallas to "quit fighting", and said "don't you bite me" and "I'm not letting you up. You keep fighting," (doc. 101, p. 10).

that the courts should "view[ ] the facts in the light depicted by the videotape." Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); Glenn as next friend, A.G. v. Britt, No. 23-11890, 2025 WL 1833956, at *3 (11th Cir. July 3, 2025) ("Although we must view the facts in favor of the nonmoving party, we accept video evidence over the nonmoving party's account when the former obviously contradicts the latter.'") (quoting Richmond v. Badia, 47 F.4th 1172, 1179 (11th Cir. 2022). "Yet, where the video does not answer all the questions or resolve all the details of the encounter, the Court must view the evidence in the light most favorable to the non-moving party. Anderson v. City of Prichard, No. 1:21-CV-388-TFM-B, 2024 WL 1298063, at *6 (S.D. Ala. Mar. 26, 2024) (citing Johnson v. City of Miami Beach, 18 F.4th 1267, 1269 (11th Cir. 2021)).

   2. Analysis

   "'Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right.'" Stephens v. DeGiovanni, 852 F.3d 1298, 1314 (11th Cir. 2017) (citation omitted). Here, the parties do not dispute that Davila was performing discretionary duties. Thus, the burden shifts to Ms. Dallas to "show that qualified immunity is not appropriate." Id. "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. The second asks whether the right in question was clearly established at the time of the violation." Id. (cleaned). The courts have "discretion to decide which question to address first." Id.

   The Court begins with the question of whether Davila violated Mr. Dallas's Fourth Amendment rights. The Fourth Amendment provides a "right of the people to be secure in their

persons ... against unreasonable searches and seizures." The Eleventh Circuit has acknowledged that "[m]aking an arrest necessarily involves 'some degree of physical coercion or threat thereof'" and that the "Fourth Amendment simply requires that the force used to effect an arrest be reasonable." Odom v. Boisvert, No. 23-11226, 2024 WL 3649048, at *3 (11th Cir. Aug. 5, 2024) (citations omitted). "Claims that law enforcement officials used excessive force while making an arrest, investigatory stop, or other seizure of a person are analyzed under the Fourth Amendment's 'objective reasonableness' standard." Senko v. Jackson, No. 22-11877, 2023 WL 2518367, at *3 (11th Cir. Mar. 15, 2023) (quoting Graham v. Connor, 490 U.S. 386, 395, 399 (1989)).

 "Because the objective-reasonableness test applies … courts do not speculate as to what government officials subjectively thought but assess their actions for objective reasonableness under established constitutional law." Stephens, 52 F. 3d at 1315 (citation omitted). "'At summary judgment, we cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances.'" Id. (citation omitted). "'[T]he question we ask is whether, under [the plaintiff's] version of the facts, [the officer] behaved reasonably in the light of the circumstances before him.'" Id. (citation and internal quotation marks omitted). "[W]hether the force an officer uses is reasonable 'requires careful attention to the facts and circumstances of each particular case.'" Id. (quoting Graham v. Connor, 490 U.S. at 396).

 "'Reasonableness is the touchstone for all excessive force claims, regardless of whether the force used was deadly.'" Coriell v. Snyder, No. 23-12746, 2024 WL 4524692, at *3 (11th Cir. Oct. 18, 2024) (quoting Hammett v. Paulding County, 875 F.3d 1036, 1048 (11th Cir.

2017)). "In assessing reasonableness, we must judge the facts 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Id. (quoting Manners v. Cannella, 891 F.3d 959, 973 (11th Cir. 2018)). "This is because '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" Id. (quoting Graham, 490 U.S. at 396–397)).

In this Circuit, "[d]etermining whether an officer's use of force is unconstitutionally excessive involves two steps. First, we ask whether the specific kind of force is categorically unconstitutional." Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021) (internal citation omitted). The Eleventh Circuit has explained that it has "drawn a distinction between the use of a taser on an uncooperative and combative individual and use of a taser on a generally cooperative individual" and that "more force is reasonable when a suspect resists and lunges at the officer" Castro-Reyes v. City of Opa-Locka, No. 24-12307, --- F. 4th ---, 2026 WL 318559, at *11-12 (11th Cir. Feb. 6, 2026) (citing Hoyt v. Cooks, 672 F.3d 972, 979-80 (11th Cir. 2012) and explaining that "use of taser between five and eighteen times reasonable when plaintiff lunged at officers and 'resisted during the entire time' officers attempted to handcuff him"). There is no evidence to support a finding that the force was categorically unconstitutional; the only evidence indicates that Mr. Dallas was resisting the Officers attempt to subdue him.

"Second, if the kind of force is not categorically unconstitutional, we then ask, weighing the Graham factors, whether the amount of force was excessive." Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021). The courts assess "whether the use of force is 'objectively reasonable' by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment

interests' against 'the countervailing governmental interests at stake' under the facts of the particular case." Castro-Reyes, 2026 WL 318559, at *10 (citing Oliver v. Fiorino, 586 F. 3d 898, 905 (11th Cir. 2009) (citing Graham, 490 U.S. at 396, 109 S. Ct. 1865)). Here, the countervailing government interest would be to protect the Officers and the public from the possibility that Mr. Dallas would take control of the Taser, use it on one or both Officers, immobilize one or both, and take their weapons.

To make this assessment, the courts "look to the nonexhaustive list of factors the Supreme Court set out in Graham." Coriell, 2024 WL 4524692, at *3 (citing Graham, 490 U.S. at 396). "These factors include: 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Id. The courts "also consider 'the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted.'" Id. (quoting Baker v. City of Madison, 67 F. 4th 1268, 1279 (11th Cir. 2023)). "[T]his multifactor analysis entails an assessment of the totality of the circumstances." Acosta v. Miami-Dade County, 97 F. 4th 1233, 1239 (11th Cir. 2024).

Davila argues that the first Graham factor – the severity of the crime at issue – weighs in his favor. He argues that Mr. Dallas "committed a serious crime by assaulting Officer Davila and Officer Hutto" when he fought the Officers after they attempted to detain him. Davila argues that a reasonable officer would believe, as he did, that Mr. Dallas's conduct "would lead to either bodily injury or death to either of the officers." (doc. 87, p. 18-19).

Ms. Dallas argues that "at best Mr. Dallas was suspected of trespassing a Class C misdemeanor under Alabama law" (doc. 97, p. 20). In support, Ms. Dallas argues that Doss, the tenant at Lot 33, told Dispatch that the black male "was merely in his yard rather than attempting

to break into his trailer" and that Dispatch "relayed the call over the radio" (Id.) Ms. Dallas also asserts that Hutto "assessed the call constituted merely a 'civil matter' and advised the dispatcher that he would be switching to another radio frequency" (Id.). From this, she argues that Davila and Hutto "were aware that no burglary had occurred" and therefore, the severity of the crime at issue weighs against Davila (Id.).

In reply, Davila argues that Ms. Dallas incorrectly focuses on an "alleged misdemeanor offense that Dallas was suspected of committing <u>before</u> Officers arrived on scene", which is not the correct standard. Davila again points out that Mr. Dallas "was engaged in conduct that resulted in an assault and battery on law enforcement officers" and therefore, the first <u>Graham</u> factor weighs in his favor (doc. 101, p. 11)

Regardless of whether Doss[29] told Dispatch that the black male was "merely in his yard", the Event Chronology indicates that the crime dispatched was "Type 54R (Burglary (Residential))" and that the "Caller adv male subj attempting to break into his trlr …" at Lot 33 (doc. 97, Dallas's Exhibit 1). Although Dispatch later said: "Subj no longer at loc last seen near trlr 27", which indicates that the subject was no longer at Doss's trailer, the dispatch was for a residential burglary.

Ms. Dallas argues that Hutto assessed the call as a civil matter. Despite what Ms. Dallas believes was said on the audio, Hutto stated in his affidavit that he and Davila "were dispatched

---

[29]  Ms. Dallas correctly states that Doss did not tell Dispatch that the subject was trying to break into the trailer. Doss told Dispatch that the subject was "in the yard, trying to get into my yard, and stuff" (doc. 97, Exhibit 3, Audio). However, the Officers were dispatched to a possible residential burglary in progress. Nothing indicates that the Officers heard Doss's conversation with Dispatch. Dispatch did not contact the Officers until after the conversation with Doss had ended.

to a possible burglary in progress" and that "Dispatch advised that the 911 caller advised that a male subject was attempting to break into his trailer" (doc. 92-1). Davila stated likewise (doc. 88, p. 5, Davila Affidavit). Their sworn affidavits are supported by the Event Chronology, and the audio of the Dispatch. Thus, no reasonable inference can be drawn that Davila and Hutto were investigating a "trespass" or a "civil matter."

Moreover, in the Eleventh Circuit "[o]ur precedent makes clear that under the first Graham factor - the severity of the crime at issue—we must assess the reasonableness of an officer's use of force by examining the circumstances at the time of the officer's actions, not the time of his initial encounter with the suspect." Spencer v. City of Orlando, Fla., 725 Fed. Appx. 928, 931 (11th Cir. 2018). The reason for the initial encounter with Mr. Dallas was the investigation of a burglary in progress. However, Hutto and Davila did not use any force against Mr. Dallas until he attempted to flee and then fought when they tried to detain him.[30] Thus, viewing Davila's actions from the perspective of a reasonable officer on the scene, an officer could reasonably conclude that Mr. Dallas engaged in an assault and battery against Hutto and Davila. Thus, this factor weighs in favor of Davila.

Davila argues that the next Graham factor – whether Mr. Dallas posed an immediate threat to the Officers – weighs in his favor. Davila points out that in addition to trying to flee and fighting with the Officers, Mr. Dallas grabbed Davila's Taser which created a fear that he might try to use the Taser on the Officers and gain access to their weapons (doc. 87, p. 22-23).

Ms. Dallas responds that this factor is "highly disputed" (doc. 97, p. 22). She

---

[30]  From the BWC video, the dry stuns appear to have started approximately 24 seconds after the fight started.

acknowledges that Mr. Dallas may have initially resisted, and thus posed an immediate danger, but argues that he had stopped resisting. She argues that the "record contains evidence that Mr. Dallas was instead making sudden and unexpected movements" because of the pain of the dry stuns and tasing. Ms. Dallas argues that as the non-movant, the evidence and all factual inferences must be drawn in her favor, and as a result, she is entitled to the inference that Mr. Dallas was not resisting but instead his sudden and unexpected movements were in reaction to the dry stuns and tasing.

The Court finds that there is not a material issue of fact in dispute that Mr. Dallas was a threat to the Officers. Whether his behavior was caused by his desire to get away, his state of being intoxicated with illegal drugs, or his "involuntary" body movements based on his reaction to being dry-stunned, he was clearly struggling with the Officers. Moreover, there is no evidence to refute the Officers' assertion that Mr. Dallas grabbed the Taser and at one point tried to bite Officer Hutto. This made him an immediate threat to the Officers.

Davila argues that the third <u>Graham</u> factor - whether Mr. Dallas actively resisted and evaded arrest - weighs in his favor. Davila states that "[f]om the moment Dallas stepped out of his vehicle, Dallas engaged in active resistance" and that he "resisted and fought officers for approximately three (3) minutes before officers could finally detain him." (doc. 87, p. 23).

Ms. Dallas responds that this factor is "highly disputed" (doc. 97, p. 22). She acknowledges that Mr. Dallas may have initially resisted and tried to flee but argues that he had stopped resisting. She again argues that the "record contains evidence that Mr. Dallas was instead making sudden and unexpected movements" because of the pain of the dry stuns and tasing. Obviously, due to Mr. Dallas's death, Ms. Dallas does not have the testimony of Mr. Dallas to refute that he was resisting arrest. Instead, Ms. Dallas relies on the testimony of

32

Natasha Powers who opines that Mr. Dallas was merely moving away from the pain which the Officers mistakenly perceived as resistance (doc. 99, p. 207). While Ms. Powers may be qualified to testify that dry stuns and tasing may cause sudden movements, she cannot testify that in this case Mr. Dallas was not resisting, even after the dry stuns were applied. To so do is to merely guess, it is not a reasonable inference. Even viewing the BWC video in a light most favorable to Ms. Dallas, does not advance her case. The BWC video is at best unclear whether Mr. Dallas is intentionally resisting. On the other hand, there is testimonial evidence that he was resisting and even attempting to bite (which is also heard on the video) the Officers. There is simply insufficient evidence from which a reasonably jury could find that a reasonable officer would not have perceived Mr. Dallas's actions as continuing to resist arrest until he was handcuffed. Thus, the third Graham factor weighs in Davila's favor.

Having determined that these factors weigh in favor of Davila, the Court next looks to the factors identified in Baker, 67 F. 4th at 1279: "The need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted." Starting with the need for application of force, this factor weighs in favor of Davila. Here, Mr. Dallas tried to flee, fought with the Officers when they tried to detain him, and did not respond to their orders to stop fighting until after the Taser was deployed. Additionally, before Officer Davila tased Mr. Dallas, he attempted to bring Mr. Dallas into compliance by use of the dry stun. And at that point, Mr. Dallas grabbed the Taser from Davila and they fought over it. The Taser was deployed only after Davila regained control of the Taser and Mr. Dallas continued to fight with Officer Hutto.

Likewise, the relationship between the need for application of force and the amount of force applied, weighs in favor of Davila. Although the dry stun appears to have been activated

33

multiple times, the Medical Examiner's report indicates that there were three abrasions consistent with dry stuns. The Court acknowledges that Mr. Dallas yelled "I can't breathe" and "help, help, help" during the time the dry stun was activated, but that alone does not support an inference that he was moving away from the dry stun because of the pain and not continuing to fight the officers. The BWC video shows that after the dry stuns were applied, Mr. Dallas continued to fight with the Officers and grabbed the Taser. Only after Davila regained control of the Taser and it was successfully deployed, did Mr. Dallas stop fighting.

The extent of the injury weighs in favor of Davila. The Medical Examiner found three abrasions consistent with dry stun injuries which did not cause serious physical injury and four deep probe injuries and two shallow probe injuries consistent with Taser deployments which typically result in a temporary incapacitation. See Cantu v. City of Dothan, Alabama, 974 F.3d 1217, 1225 (11th Cir. 2020) ("The usual result of being tased with the device in the prong mode is temporary incapacitation and inability to move. … [The dry stun mode] can be used in an attempt to obtain compliance by causing pain, but it generally does not incapacitate a person as the prong mode is designed to do. … Drive stun mode tasing does not cause serious physical injury."); Wilson v. Horne, No. 5:21-CV-60, 2023 WL 5948366, at *5 (S.D. Ga. Aug. 15, 2023), report and recommendation adopted, No. 5:21-CV-60, 2023 WL 5938805 (S.D. Ga. Sept. 12, 2023) (finding Wilson "likely had minor injuries from the taser prongs" following three taser deployments during a fight with officers).

Unfortunately, Mr. Dallas died from a heart attack approximately twenty minutes after he was handcuffed. However, the Medical Examiner "concluded to a reasonable degree of medical probability and certainty that [Mr. Dallas] died as a result of acute myocardial ischemia and cardiorespiratory failure caused by mixed drug toxicity – including toxicity from the presence of

34

methamphetamine, ABD-BUTINACA, and MDMB-4en-PINACA" (doc. 92-2, ¶ 13.). He also concluded "to a reasonable degree of medical probability and certainty that the Taser deployment on July 2, 2023 did not cause [Mr. Dallas's] death." (Id.).    There is no evidence to refute these findings.

Accordingly, the Court concludes that because Davila's use of force was objectively reasonable, he did not violate Mr. Dallas's Fourth Amendment rights and is entitled to qualified immunity. Since there has been no constitutional violation, the Court need not address whether the rights were clearly established at the time of the incident.

B. Claim Six – Wrongful Death

Ms. Dallas claims that Davila along with Hutto "committed an assault and battery when they knowingly struck and tased Mr. Dallas that resulted in the untimely and unlawful death of Jawan Dallas." (doc. 25, p. 28-30). In response, Davila argues that under Alabama law he is entitled to state agent immunity from tort liability (doc. 87, p. 28-31). Davila is correct. Hunter v. City of Leeds, 941 F.3d 1265, 1283–84 (11th Cir. 2019) ("For the same reasons that Jackson, Reaves, and Chalian are entitled to qualified immunity on Hunter's § 1983 claim, we find that they are also entitled to discretionary-function immunity on Hunter's state-law claims."… By the same token, the same facts that establish that Kirk is not entitled to qualified immunity also establish that he is not entitled to discretionary-function immunity.").

C. Causation

Because the Court has found in favor of the City and Hutto and determined that Office Davila is entitled to qualified immunity on the federal constitutional claim and discretionary-function immunity on the state-law claim, the Court need not address the parties' arguments as to medical causation.

35

VI. <u>Conclusion</u>

Upon consideration, and for the reasons set forth herein, Hutto's Motion for Summary Judgment is GRANTED; the City's Motion for Summary Judgment is GRANTED; and Davila's Motion for Summary Judgment is GRANTED.

Judgment shall be entered by separate document as required by Fed. R. Civ. P. 58(a).

DONE and ORDERED this the 10th day of March 2026.

<u>s/ Kristi K. DuBose</u>
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE